In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-2184

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MARVIN PEUGH,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 08 CR 50014-1—**Frederick J. Kapala**, *Judge.*

ARGUED SEPTEMBER 20, 2011—DECIDED MARCH 28, 2012

Before ROVNER, WOOD and WILLIAMS, *Circuit Judges.*

ROVNER, *Circuit Judge.* Marvin Peugh was convicted after a jury trial of five counts of bank fraud, sentenced to 70 months' imprisonment, and ordered to pay nearly two million dollars in restitution. He challenges his conviction and sentence on the following grounds: that his indictment was multiplicitous; that the prosecution did not present sufficient evidence to prove his guilt beyond a reasonable doubt; that his sentence violated

the ex post facto clause; that the district court miscalculated the loss and restitution amounts; that an enhancement for obstruction of justice should not have been imposed; and that the disparity between his sentence and his co-defendant's was improper. We affirm.

## I.

In 1996 Peugh and his first cousin, Steven Hollewell, formed two companies to do business with the farmers of Illinois: the Grainery, Inc., which bought, stored, and sold grain, and Agri-Tech, Inc., which provided custom farming services to landowners and tenants. When the Grainery began to experience cash-flow problems in 1999, the cousins obtained bank loans from the State Bank of Davis (later known simply as the State Bank) by falsely representing that valuable contracts existed for future grain deliveries from Agri-Tech to the Grainery. They also inflated the balances of bank accounts under their control by writing a series of bad checks between accounts. As a result of these activities, Peugh and Hollewell were charged with two bank-fraud schemes—loan fraud and check kiting—in violation of 18 U.S.C. § 1344.

The indictment alleged that from January 1999 to August 2000 Peugh and Hollewell executed both schemes multiple times. Counts 1-3 charged the two men with defrauding State Bank of more than $2.5 million by supporting loan applications with materially fraudulent and misleading information, specifically, financial reports describing the sham grain-delivery contracts between Agri-

Tech and the Grainery. According to the indictment, Peugh and Hollewell applied for the first loan in January 1999 ($2,000,000), the second in February 2000 ($200,000), and the third in June 2000 ($350,000). Counts 4-9 of the indictment charged Peugh and Hollewell with five instances of check kiting by writing a series of bad checks between business and personal accounts. This scheme allowed the cousins to overdraw an account at Savanna Bank by $471,000.

Peugh pleaded not guilty to all charges. Hollewell pleaded guilty to one count of check kiting and agreed to testify against Peugh in exchange for the other counts being dropped.

At trial Hollewell testified that the grain-delivery contracts between Agri-Tech and the Grainery were a sham from the start: he and Peugh had never intended for Agri-Tech to deliver grain to the Grainery and Agri-Tech had no means to fulfill the contracts. Hollewell's admissions were supported by the testimony of Bernard Reese, who was Agri-Tech's secretary and a member of its board of directors. Reese explained that Agri-Tech did not own any grain, that the board had never approved the buying or selling of grain, and that he had never seen the grain-delivery contracts before the criminal investigation of Peugh and Hollewell began. A representative from State Bank then testified that approval of the Grainery loans depended on the existence of the Agri-Tech grain-delivery contracts, which composed nearly half of the Grainery's assets in contracts.

The jury also heard testimony about the check-kiting scheme. An FBI expert on check kites described his

analysis of Peugh and Hollewell's bank records and testified that the cousins had engaged in a check kite from April to August of 2000. Hollewell's father, Harlan Hollewell ("Harlan"), testified that his son and Peugh came to him in August 2000 after officials from Savanna Bank confronted them with an overdraft of approximately $471,000. According to Harlan, Peugh and Hollewell implored him to cover this deficit—they told him that the bank was demanding immediate payment and that they could face jail time if he did not supply the money—and he complied.

Peugh testified in his own defense. As to the grain-delivery contracts between Agri-Tech and the Grainery, he conceded that Agri-Tech had no grain to sell, but he insisted that the contracts were nonetheless made in good faith. Agri-Tech customers were to supply the grain, he claimed, though he admitted that no Agri-Tech customer had actually agreed to supply grain. Regarding the check kite, Peugh maintained that he had not intended to defraud Savanna Bank; the bank was never in danger of loss, he said, because Harlan had previously promised to cover any overdrafts. (Harlan testified to the contrary.) Peugh could not explain, however, why he and Hollewell risked the check kite if Harlan was willing to supply the funds they needed. The jury found Peugh guilty of the charges in counts 3, 4, 5, 8, and 9 and acquitted him of the rest.

At sentencing Peugh raised a number of objections to the presentence report. He first argued that sentencing him under the 2009 guidelines (then in effect) rather

than under the 1999 guidelines (in effect at the time he committed his offenses) would violate the ex post facto clause because it would result in a significantly higher sentencing range. The court rejected this argument based on *United States v. Demaree*, 459 F.3d 791, 795 (7th Cir. 2006), in which we held that using the guidelines in effect at the time of sentencing rather than the time of the offense does not violate the ex post facto clause because the guidelines are merely advisory.

Peugh also challenged the presentence report's loss-amount calculation, contending that the loss amount should have been reduced by the interest he paid on the loans. The court, however, agreed with the government that the interest payments were irrelevant because they did not reduce the loans' outstanding principal balance. Peugh similarly argued that the money Harlan paid to cover the bank overdraft should be subtracted from the loss amount, but the court explained that Harlan made this payment after the bank had detected the loss, and only money paid to a victim *before* detection of an offense can be deducted.

Peugh next objected to the presentence report's restitution calculation, arguing that he should not have to pay restitution for the loans described in counts 1 and 2 because he was acquitted on those counts. But the court concluded that the Mandatory Victim Restitution Act required restitution to be made for all three loans because a preponderance of the evidence showed all three to have been part of the loan-fraud scheme alleged in count 3, on which Peugh was convicted.

Finally, Peugh contended that he should receive the same prison sentence as Hollewell—12 months—to avoid an unwarranted disparity in sentences. The district court rejected this argument because, unlike Hollewell, Peugh went to trial, did not assist the government, and obstructed justice by perjuring himself.

The court sentenced Peugh within the guidelines to 70 months' imprisonment and three years' supervised release and made Peugh and Hollewell jointly and severally liable for restitution in the amount of $1,967,055.30. This was the total outstanding balance due on the three loans, less what the bank was able to recover by disposing of collateral. The check-kiting money was not included in the restitution amount because it had been repaid by Harlan.

II.

*A. Multiplicity*

On appeal Peugh argues for the first time that the indictment in his case was multiplicitous. An indictment is multiplicitous—and a violation of the Fifth Amendment's double jeopardy clause—if it charges a single offense in more than one count. *See United States v. Hassebrock*, 663 F.3d 906, 916 (7th Cir. 2011); *United States v. Allender*, 62 F.3d 909, 912 (7th Cir. 1995). According to Peugh, counts 1-3 charged him three times with fraudulently obtaining a single loan, and so his loan-fraud conviction should be reversed. Because Peugh did not raise this issue in the district court, we review for plain error. *See Hassebrock*, 663 F.3d at 916.

There was no plain error in the district court's failure to strike counts 1-3 for multiplicity. The indictment did not charge Peugh with fraudulently obtaining just one loan; rather, counts 1-3 charged him with fraudulently obtaining *three* loans in the course of a single bank-fraud scheme. Each loan constituted a separate "execution" of the scheme, and each execution of a bank-fraud scheme can be charged in a separate count. *See, e.g.*, *Allender*, 62 F.3d at 912; *United States v. Longfellow*, 43 F.3d 318, 323 (7th Cir. 1994); *United States v. De La Mata*, 266 F.3d 1275, 1287 (11th Cir. 2001); *United States v. Colton*, 231 F.3d 890, 909 (4th Cir. 2000). Conduct generally qualifies as an "execution" rather than an "act in furtherance" when it is chronologically and substantively distinct and subjects the victim to additional risk of loss. *Longfellow*, 43 F.3d at 323-24. Here, although one bank made all of the loans, Peugh and Hollewell applied for each loan at a different times with different supporting documents, and each loan put the bank at additional risk of loss.

### B.  Sufficiency of Evidence

Peugh next contends that the prosecution failed to prove one of the elements of his offense beyond a reasonable doubt: his specific intent to defraud State Bank. But intent need not be proved by direct evidence; the jury was free to infer Peugh's intent to defraud from his actions—for instance his submitting on three occasions fraudulent and misleading information to State Bank in support of loan applications—and disbelieve his contrary testimony. *See United States v. Howard*, 619 F.3d 723,

727 (7th Cir. 2010). Because a rational jury could have found beyond a reasonable doubt that Peugh intended to defraud State Bank, the evidence of his intent was sufficient to support his conviction. *See United States v. Durham*, 645 F.3d 883, 892 (7th Cir. 2011).

## C. *Ex Post Facto/Demaree*

Peugh renews his argument that the district court violated the ex post facto clause by calculating his sentence under the 2009 rather than the 1999 guidelines, which were in effect at the time he committed his offenses. Under the 2009 guidelines, Peugh's advisory range jumped by more than 20 months. Peugh acknowledges that our holding in *United States v. Demaree*, 459 F.3d 791, 795 (7th Cir. 2006), undercuts his position, but he urges us to reconsider that case and overrule it. We, however, stand by *Demaree*'s reasoning—the advisory nature of the guidelines vitiates any ex post facto problem—and again decline the invitation to overrule it, *see, e.g.*, *United States v. Robertson*, 662 F.3d 871, 876 (7th Cir. 2011); *United States v. Holcomb*, 657 F.3d 445, 448-49 (7th Cir. 2011); *United States v. Favara*, 615 F.3d 824, 829 (7th Cir. 2010).

## D. *Loss Amount*

Peugh maintains that the district court should have reduced the loss amount by $213,000—the interest he paid on the loans from State Bank—because he gave this money to his victim before the fraud was discovered. Under the guidelines, "money returned . . . to the victim

before the offense was detected" is to be credited against loss. U.S.S.G. § 2B1.1, Application Note 3(E)(i); *United States v. Hausmann*, 345 F.3d 952, 960 (7th Cir. 2003).

We have not had occasion to address whether interest payments should be credited against loss in fraudulent loan cases, but we conclude that the district court correctly declined to deduct Peugh's interest payments from the loss amount. These payments were not money "returned" to State Bank: they did not reduce the loans' outstanding principal balance; instead they were exchanged for value in the form of time holding the bank's money. *See United States v. Johnson*, 16 F.3d 166, 171 (7th Cir. 1994) (explaining that in fraudulent loan cases, loss is measured "by the difference in value exchanged rather than simply by the face value of the loan or by the gross amount of money that changes hands"). Moreover, the guidelines specify that "interest of any kind" is to be excluded from the loss amount. *See* U.S.S.G. § 2B1.1, Application Note 3(D)(i). This implies that interest, whether paid or unpaid, is to play no role in the loss calculation. In other words, if interest accrued does not increase the loss amount—and it did not here—then interest paid should not reduce it either. *See United States v. Allen*, 88 F.3d 765, 771 (9th Cir. 1996) ("[T]he district court used only the loan principal to calculate the 'amount of the loan;' it did not consider accrued interest. Therefore, payments made toward interest cannot be considered as repayments made on the loan.*");* *United States v. Coghill*, 204 Fed.Appx. 328, 330, 2006 WL 3327057 (4th Cir. Nov. 15, 2006) (unpublished) (holding that neither interest accrued nor interest paid

should factor into the loss amount). Additionally, money spent to facilitate fraud is not deductible from the loss amount, *see United States v. Spano*, 421 F.3d 599, 607 (7th Cir. 2005), and Peugh's interest payments facilitated his loan-fraud scheme by keeping him in good standing with State Bank while he fraudulently obtained additional loans.

Peugh also contends, as he did in the district court, that the loss amount should have been reduced by the $471,000 that Harlan paid to cover the cousins' check-kiting overdraft. Harlan repaid this money to Savanna Bank years before Peugh and Hollewell were charged with a crime; according to Peugh, this means that the money was returned "before the offense was detected" by the victim. We disagree. A victim can detect an offense without understanding its full scope, and "[t]he time to determine [the] loss in a check-kiting scheme is the moment the loss is detected," *United States v. Mau*, 45 F.3d 212, 216 (7th Cir. 1998). Savanna Bank officials may have been unaware when they demanded repayment that they had uncovered part of a scheme involving at least 275 bad checks, but this does not undermine the district court's conclusion that the bank detected Peugh's offense as soon as it discovered its loss.

*E. Restitution*

Peugh renews his objection to paying restitution in the amount of $1,967,055.30, which is the sum of the outstanding balances of the three loans described in counts 1-3, less collateral. He points out that the jury acquitted him on counts 1 and 2 and that restitution can be

assessed only for losses related to a count of conviction; thus, he reasons, he should only have to pay restitution for the $350,000 loan described in count 3.

Peugh is correct that he can be required to pay restitution only for losses caused by crimes of which he was convicted, *see United States v. Frith*, 461 F.3d 914, 920-21 (7th Cir. 2006); *United States v. Belk*, 435 F.3d 817, 819-20 (7th Cir. 2006), but he is wrong that the district court should not have ordered him to pay restitution for all three loans described in the indictment. When a "scheme" is an element of the offense of conviction—as it is in bank fraud, *see* 18 U.S.C. § 1344—the Mandatory Victim Restitution Act requires restitution for the losses caused by the *entire* scheme, even if the defendant is not convicted of all of the conduct that caused loss. *See* 18 U.S.C. § 3663A(a)(2); *Belk*, 435 F.3d at 819-20. Here, Peugh was convicted on count 3—which alleged that he fraudulently obtained a $350,000 loan as part of a broader scheme to defraud State Bank of more than $2.5 million—and the district court found by a preponderance of the evidence that the loans described in counts 1 and 2 were part of that scheme. Because restitution is calculated based on a preponderance of the evidence, *see* 18 U.S.C. § 3664(e); *United States v. Danford*, 435 F.3d 682, 689 (7th Cir. 2006)—a lower standard than beyond a reasonable doubt—Peugh's acquittals on counts 1 and 2 had no bearing on the amount of restitution to be ordered for his conviction on count 3.

*F.  Enhancement for Obstruction of Justice (Perjury)*

Peugh also agues that the district court abused its discretion by raising his offense level by two on the basis that he obstructed justice. We disagree. The district court explained that the obstruction-of-justice enhancement under U.S.S.G. § 3C1.1 was appropriate in this case because Peugh perjured himself at trial. The court cited evidence of Peugh's material, willful, and false statements, *see United States v. Ellis*, 548 F.3d 539, 545 (7th Cir. 2008), by discussing how his statements conflicted with the testimony of Steven Hollewell, Harlan Hollewell, and Bernard Reese. Peugh attributes these conflicts to lies or outdated recollections on the part of the others—noting for instance Harlan's inability to remember all the details of his business dealings with his son and Peugh—but we see no reason to disturb the district court's assessment of the testimony.

*G.  Sentencing Disparity*

Finally, Peugh argues that the disparity between his six-year sentence and Hollewell's one-year sentence was improper under 18 U.S.C. § 3553(a)(6), which calls for similar sentences for similarly situated defendants. He points out that neither he nor Hollewell had prior convictions and that both were charged with the same offenses. That, however, is where the similarities end. Only Hollewell pleaded guilty and cooperated with the government. Peugh instead went to trial and obstructed justice by perjuring himself. Such distinctions

warrant disparate sentences. *See United States v. Doe*, 613 F.3d 681, 690-91 (7th Cir. 2010).

AFFIRMED.