In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 13-2648

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

ROBERT G. NELSON,

*Defendant-Appellant*.

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11 CR 792 — **Samuel Der-Yeghiayan**, *Judge*.

_____

ARGUED OCTOBER 8, 2014 — DECIDED DECEMBER 19, 2014

_____

Before POSNER, FLAUM, and SYKES, *Circuit Judges*.

PER CURIAM. Robert Nelson was convicted of mail fraud, 18 U.S.C. § 1341, sentenced within the guidelines range to 66 months' imprisonment, and ordered to pay about $2.6 million in restitution. Although the number of victims exceeds 30, more than $1 million of the $2.6 million total loss found by the district court was attributed to just three of them. Those victims and their individual losses are at the center of this appeal, in which Nelson argues that the district

court significantly overstated the total loss by crediting
unreliable evidence and failing to resolve discrepancies
between the parties' positions on the victims' losses. We
conclude that the record adequately supports the district
court's findings, and thus we affirm the judgment.

Nelson entered into a plea agreement admitting that he
masterminded a Ponzi scheme in which he falsely promised
investors that he would put their money into real estate and
promptly earn them a significant return, sometimes as high
as 45%. According to the presentence investigation report,
Nelson's investors lost approximately $2.597 million. Be-
cause that figure exceeds $2.5 million, the probation officer
recommended an 18-level increase to Nelson's offense level,
resulting in a guidelines imprisonment range of 63 to
78 months. *See* U.S.S.G. § 2B1.1(b)(1)(J). Nelson conceded
that the loss was at least $1 million but disagreed that it had
reached $2.5 million. If, as Nelson asserted, the loss was
more than $1 million but shy of $2.5 million, then the in-
crease in offense level would have been 16 instead of 18,
*see id.* § 2B1.1(b)(1)(I), and the imprisonment range would
have dropped to 51 to 63 months.

The government and Nelson agreed about *who* was on
the list of victims. For all but three of the victims on that list,
they also agreed on amount of loss, which totaled approxi-
mately $1.5 million. So the district court's choice between an
increase of 16 or 18 offense levels came down to three vic-
tims: 3G Developments, DKW Investments, and JNL Finan-
cial. According to the government, 3G lost $507,000; DKW
lost $372,000; and JNL lost $235,000. Nelson's position was
that 3G lost $73,500; DKW lost $34,000; and JNL lost nothing.

For guidelines purposes the loss attributable to mail fraud excludes money obtained by deception but then returned before the crime was detected. *Id.* § 2B1.1 cmt. n.3(E); *United States v. Peugh*, 675 F.3d 736, 741 (7th Cir. 2012), *rev'd on other grounds*, 133 S. Ct. 2072 (2013); *United States v. Brownell*, 495 F.3d 459, 463–64 (7th Cir. 2007); *United States v. Snelling*, 768 F.3d 509, 513–14 (6th Cir. 2014). The parties agreed that Nelson had repaid $348,000 to 3G, but they disagreed about the size of 3G's investment. The government asserted that 3G invested $855,000; Nelson maintained that the figure was $421,500. Nelson's bank statements indeed documented $421,500 in transfers from 3G, but the government asserted that the balance was paid in currency.

In support of that assertion, the government submitted two receipts bearing the signatures of both Nelson and Steve Galvin, 3G's principal. The first receipt states, "I, Robert Nelson, have received a total loan amount of $805,000 over the past few years in various installments from 3G Developments and Steve Galvin." The second receipt states, "I, Robert Nelson, received a loan in the amount of $50,000 from Steve Galvin." The government also called Galvin as a witness. Galvin testified that 3G had given Nelson approximately $855,000—in principal investments, excluding purported earnings that 3G allowed Nelson to retain and reinvest—through "bank transfers" and "cash transactions." He also testified that Nelson had issued promissory notes documenting the currency transactions.

Defense counsel argued that the government proved no more than the $421,500 in deposits corroborated by Nelson's bank statements and also that the two loan receipts the

government submitted reflected accrued but unpaid "interest upon interest upon interest," which is excluded from the calculation of loss. *See* U.S.S.G. § 2B1.1 cmt. n.3(D)(i); *Peugh*, 675 F.3d at 741; *United States v. Alexander*, 679 F.3d 721, 731 (8th Cir.), *cert. denied,* 133 S. Ct. 379 (2012); *United States v. Kennedy*, 554 F.3d 415, 419 (3d Cir. 2009); *but see United States v. Hsu*, 669 F.3d 112, 122 (2d Cir. 2012). The district court rejected these arguments, credited Galvin's testimony, and concluded that the government's "documentary exhibits and testimony" substantiated that 3G's initial investment was $855,000 for a net loss of $507,000.

Regarding DKW's loss, the parties agreed on the amount of the initial investment but disputed whether that entire amount was procured by Nelson through fraud. The evidence showed that DKW invested $938,000 and that Nelson returned $566,000, but Nelson disputed whether the entire investment related to the charged scheme. Christopher Kuzlik, DKW's owner, told investigators that the government's loss calculation of $372,000 ($938,000 less $566,000) "sounded about right," and the government submitted the investigators' memorandum detailing that interview. In response defense counsel proffered that Kuzlik told him that only "around $600,000" was related to the fraudulent scheme and the rest concerned other deals in Kuzlik's ongoing business relationship with Nelson. But defense counsel did not back up the proffer with evidence, so the district court accepted the prosecutor's loss figure, explaining that it was substantiated by the "memorandum of interview showing that during the relevant time period, DKW loaned the defendant $938,000 relating to the scheme in this case."

Finally, the parties agreed that JNL's owner, Philip Lagori, invested approximately $505,000 but thought that Nelson had repaid him in full. The government maintained, however, that $235,000 of that amount was not returned to JNL but to Maxim Mortgage, another business owned by Lagori, and that Nelson should not receive credit for payments to Maxim Mortgage because it was a distinct entity from JNL. The district court accepted the government's argument.

The court then adopted the presentence report without change, sentenced Nelson to 66 months in prison, and ordered him to pay about $2.6 million in restitution to the victims of his fraud.

On appeal Nelson argues that the district court violated his right to due process by basing the loss amount on unreliable evidence and failing to resolve discrepancies in the parties' positions concerning losses suffered by 3G, DKW, and JNL. We disagree.

"A defendant is entitled to have sentencing determinations made based on reliable evidence rather than speculation or unfounded allegations." *Warren v. Baenen*, 712 F.3d 1090, 1104 (7th Cir. 2013); *see United States v. England*, 555 F.3d 616, 622 (7th Cir. 2009). The district court's loss findings are supported by reliable evidence. The court accepted the government's calculation of 3G's loss because that figure was substantiated by loan receipts and Galvin's testimony that 3G had given Nelson more than $400,000 in addition to the amounts documented in bank statements. Likewise, the court credited the government's calculation of DKW's loss because the number was supported by the investigators' memorandum of an interview with Kuzlik.

(Although this memorandum is not part of the record on appeal, Nelson's appellate counsel assured us at oral argument that his predecessor had a copy at sentencing.) Finally, the court sided with the government concerning JNL's loss because the government submitted a chart showing JNL's transactions with Nelson and proffered, without contradiction from defense counsel, that Maxim Mortgage was unrelated to JNL.

The district court did not clearly err in crediting the government's evidence despite Nelson's insistence that Galvin was an unreliable witness, that Kuzlik had inconsistently reported the amount of his investment in the fraud, and that Lagori may have used both JNL and Maxim Mortgage to invest in the fraud. A loss calculation is clearly erroneous only if it is "outside the realm of permissible computations." *See United States v. Littrice*, 666 F.3d 1053, 1060 (7th Cir. 2012) (citation and internal quotation marks omitted). The district court's loss calculation has adequate evidentiary support and is well within the realm of permissible computations. Because the court did not clearly err in calculating the loss amount, Nelson's due-process argument also fails.

AFFIRMED.